**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| RCR INTERNATIONAL INC., *et al.*, | ) Case No. 18-10112 (   ) |
| | ) |
| | ) Joint Administration Requested |
| Debtors in a Foreign Proceeding.[1] | ) |

**DECLARATION OF MARIO PETRAGLIA IN SUPPORT OF (I)**
**CHAPTER 15 PETITIONS FOR RECOGNITION OF FOREIGN MAIN**
**PROCEEDING; (II) MOTION OF FOREIGN REPRESENTATIVE**
**FOR ENTRY OF PROVISIONAL AND FINAL RELIEF IN AID OF FOREIGN**
**MAIN PROCEEDING; AND (III) CERTAIN RELATED RELIEF**

I, Mario Petraglia, declare as follows:

1.      I am the President and Chief Executive Officer of RCR International Inc. ("RCR").   RCR and its wholly-owned subsidiary, W.J. Dennis & Company ("Dennis"), are the debtors in the above-captioned chapter 15 cases (the "Debtors").   RCR is the authorized foreign representative of the Debtors (in such capacity, the "Foreign Representative").

2.      On November 21, 2017, the Debtors commenced a proceeding (the "Canadian Proceeding") under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Quebec Superior Court of Justice (Commercial Division) in the Judicial District of Montréal (the "Canadian Court").   On the same date, the Canadian Court issued an initial order (as amended on January 16, 2018 and restated from time to time, the "Canadian Initial Order") that, among other things, granted a stay of proceedings against the Debtors.

---

[1]      The Debtors in these jointly administered cases are RCR International Inc. and W.J. Dennis & Company. The Debtors' mailing address is 180, rue de Normandie, Boucherville (Québec), J4B 5S7, Canada.   RCR International Inc.'s Canadian Business Registration Number is 104424031RC0002 and the last four digits of W.J. Dennis & Company's U.S. federal EIN are 3775.

3.      On January 16, 2018, the Canadian Court amended and restated the Canadian Initial Order to authorize RCR to act as the foreign representative of the Debtors and, in that capacity, to seek recognition of the Canadian Proceeding in the United States as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

4.      On the date hereof, the Foreign Representative filed chapter 15 petitions for recognition of the Canadian Proceeding as a foreign main proceeding.   I make this declaration in support of the chapter 15 petitions, as well as the Foreign Representative's request for entry of orders granting provisional and final relief in aid of the foreign main proceeding, and certain related relief.

5.      In my capacity as President and CEO of RCR, I am familiar with the Debtors' business, day-to-day operations, financial affairs and I have been closely involved in the Debtors' restructuring efforts.   I am over the age of 18 and, if called upon, could and would testify to the facts set forth in this declaration.   Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management and professionals, learned from my review of relevant documents, or my opinion based upon my experience.

## BACKGROUND

### A.      General Background

6.      RCR and Dennis manufacture and sell home improvement products related to weather-stripping, insulation and floor protection to retailers who then sell the products to end consumers.   RCR distributes under the following brand names: Climaloc, Essentia, Air Hose, Easy Screen, Polar Grip, T-Rex, Topsi-Clean and Seal-a-Crack.   In 2016, RCR's three

largest customers by sales were large do-it-yourself home renovation stores, accounting for 50% of gross revenue for the Debtors.

7.      Most of the Debtors' senior management is located at the Debtors' corporate head office in Boucherville, Québec.    The Debtors also lease and operate a 174,000 square foot distribution center in Boucherville, Québec.    As of November 20, 2017, the Debtors employed approximately 150 people in Canada and 4 people in the United States.    The Debtors employ approximately 26 people at their distribution center and 51 people at their head office.

8.      RCR is incorporated pursuant to the Canada Business Corporations Act. Its registered office is 1155 Réne-Lévesque Blvd W, Suite 4100, Montréal, Québec, H3B 3V2, and its principal place of business is 180, rue de Normandie, Boucherville, Québec J4B 5S7. Dennis is incorporated under the laws of the laws of the State of Delaware, with its registered office located at 1209 Orange Street, Wilmington, DE 19801.    Dennis' U.S. head office is located at 1111 Davis Road, Elgin, Illinois 60123 and its Canadian headquarters are shared with RCR at 180, rue de Normandie, Boucherville, Québec J4B 5S7.

9.      RCR has historically manufactured over half of its products in Canada. Prior to October 2017, RCR manufactured some products in a leased 90,000 square foot manufacturing facility located in Longueuil, Québec.    Manufacturing in Canada resulted in high manufacturing costs, which in turn forced the Debtors to raise product prices.    Due to the high price point associated with the products, several of the Debtors' largest customers significantly reduced purchases over the past three years.    Additionally, there has been a general market decrease in demand for weather-stripping home improvement products attributable to above-seasonal temperatures throughout North America in the past three years.

10.      In response to these headwinds, the Debtors transformed their operations from an in-house manufacturing model to a fully outsourced procurement-based model in order to optimize operational efficiencies and decrease costs.    As part of this transformation, the Debtors have developed a global network of primary suppliers that provide strategic sourcing for the manufacturing of the goods that the Debtors distribute.    Due to the transformation of the Debtors' supply network, on October 5, 2017, all business activities at the Québec manufacturing facility were suspended and the 54 full-time employees working at the facility were temporarily laid off while the Debtors reviewed their business operations.

11.      As of the date hereof, the Debtors have not made any final decisions with respect to the permanent shut-down of its manufacturing facility.

**B.      The Debtors' Financials**

1.      *Overview*

12.      The Debtors' business is currently enduring a multi-year decline, with the Debtors' customers significantly reducing purchases of products over the last three years in favor of less expensive alternatives.    Furthermore, the overall market for weather-stripping home improvement products has softened in response to above-average winter temperatures across North America over the last three years.

13.      As of September 30, 2017, the Debtors' unaudited financial statements reflected total liabilities in the amount of $58,354,705 and total assets of $54,487,176.[2]    For the period ending September 30, 2017, gross sales were $33.6 million with EBITDA of negative $5.5 million.    Revenue loss is tied to the loss of certain product lines, high prices for products manufactured in Canada, and abnormally warm North American temperatures.    The Debtors

---

[2]      All values are stated Canadian dollars unless otherwise noted.

were not profitable as of September 30, 2017, do not expect to return to profitability in fiscal year 2017.

14.     Furthermore, the Debtors have incurred significant losses and experienced negative operating cash flow for the past three years.    In fiscal year 2014, the Debtors had a loss of $88,000, while in fiscal year 2016, the loss increased to $12,845,000.

2.     *Material Indebtedness*

15.     As of November 20, 2017, RCR owed $34.7 million, inclusive of withdrawals and interest, to Bank of Montreal ("BMO") based on withdrawals RCR made from four credit facilities ("BMO Credit Facilities").    Dennis is a guarantor under the BMO Credit Facilities.    The BMO Credit Facilities are secured by liens on the Debtors' assets.    As a result of certain covenant defaults under the BMO Credit Facilities, including the failure to meet certain EBITDA thresholds and coverage ratios, the Debtors and BMO entered into a forbearance agreement in July, 2016.    The forbearance agreement was extended multiple times in 2016 and 2017.

16.     In addition to amounts owed to the BMO Credit Facilities, the Debtors owe approximately $11.9 million to various trade creditors, including suppliers, landlords, shipping providers and customs brokers.

17.     Pursuant to the Canadian Initial Order, the Debtors secured debtor-in-possession financing ("DIP Financing") from BMO through a revolving facility of up to a maximum amount of $3.0 million (the "DIP Facility").    As of the date hereof, the Debtors have drawn upon approximately $2.0 million of the DIP Facility.

C.     **Efforts to Sell or Restructure**

18.     Given the Debtors deteriorating financial condition and need to restructure their obligations, on September 11, 2017, the Debtors engaged Lincoln International LLC as financial advisor to assist them in reviewing and considering potential strategic alternatives, such as the solicitation of a new investment or a sale of all or a part of the Debtors' business.   BMO was consulted in the selection of the financial advisor and acquiesced to the Debtors engaging Lincoln and commencing the sales process.

19.     Shortly thereafter, the Debtors and Lincoln worked together to prepare detailed marketing materials such as a confidentiality agreement for potential buyers, teaser letter, financial model, and a confidential information presentation (the "CIP").

20.     Lincoln identified and contacted a total of 168 potential buyers, 98 strategic buyers and 69 financial buyers.   Of those potential buyers, over 75% responded, and 35% executed the confidentiality agreement and reviewed the CIP.

21.     The deadline for submitting an indication of interest ("IOI") for the Debtors was November 16, 2017.   Of the potential buyers identified, Lincoln received six IOIs, four from strategic buyers and two from financial buyers.

22.     The Debtors sought, and were granted approval of the continuation of the sales process by the Canadian Court under the Canadian Initial Order.   The approved sales process consists of a two-phase bidding process with an anticipated closing date of February 28, 2018.

23.     As of the date hereof, the sales process remains on going.   Given the Debtors' liquidity crisis, the Debtors and Lincoln believe that the best way to maximize the value of the Debtors for the benefit of all stakeholders, especially the employees, is to continue the sales process.

**D.**     **Events Leading to the Commencement of the Canadian Proceeding**

24.     On October 31, 2017, and pursuant to the issuance of the September 30, 2017 internal financial statements, RCR defaulted on an EBITDA ratio requirement set forth in its forbearance agreements with BMO.   Concurrently with this default, the Debtors, with the assistance of their advisors, determined that a borrowing base lending formula was an inadequate form of borrowing.

25.     Additionally, throughout October and November 2017, RCR received demand letters from counsel to a total of 11 unsecured creditors, demanding payment of approximately CAD$1,300,000 and USD$120,000.   On November 2, 2017, RCR received communications from the landlord on the Longueuil facility indicating that it was in the process of preparing a bankruptcy petition against RCR.   Thereafter, RCR received a "statement of claim" from at least two Canadian creditors, and, on November 14, 2017, RCR received from another creditor's counsel a petition for a bankruptcy order that was presentable on November 30, 2017.

26.     Due to the Debtors financial condition and liquidity constraints, the Debtors did not have sufficient funds to repay their obligations to BMO or bring their accounts current with their unsecured creditors and their landlord.    In light of this, the Debtors required a stay of proceedings to maintain the status quo while Lincoln continues to market the business as a going concern.

27.     Therefore, in the exercise of their sound business judgment, the Debtors commenced the Canadian Proceeding to maximize the enterprise value obtained for the Debtors, which the Debtors believe will present the best outcome for all stakeholders.

**E.        Commencement of the Canadian Proceedings**

28.    On November 21, 2017, the Debtors commenced the Canadian Proceeding under the CCAA by filing an *Application for the Issuance of an Initial Order* (the "Application") in the Canadian Court.    A true and correct copy of the Application, which contains additional detail on the Debtors, their businesses, and the circumstances leading to the Canadian Proceeding, is attached as **Exhibit A** and is incorporated herein by reference.

29.    On November 21, 2017, the Canadian Court issued and entered the Canadian Initial Order granting a stay of proceedings against the Debtors and their property, among other relief, to allow the sale process to continue under the supervision of the Canadian Court and the Monitor (defined below).    By a further order dated December 20, 2017, the Canadian Court extended the stay of proceedings provided in the Canadian Initial Order to March 9, 2018.    Copies of the Canadian Court's orders are attached to the Debtors' chapter 15 petitions.

**F.        The Canadian Court Appoints RCR as the Foreign Representative of the Debtors**

30.    On January 16, 2018, the Canadian Court amended and restated the Canadian Initial Order to authorize RCR to act as the foreign representative of the Debtors, and in that capacity, to seek recognition of the Canadian Proceeding in the United States as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

**RECOGNITION AND OTHER RELIEF REQUESTED**

**A.        Recognition of the Canadian Proceeding as a Foreign Main Proceeding**

31.    The Canadian Proceeding is a collective judicial proceeding brought under the CCAA, is supervised by the Canadian Court through the Monitor (as defined below).    The CCAA provides for a controlled reorganization procedure designed to enable financially

distressed companies to avoid foreclosure or seizure of assets while maximizing the companies' value as a going concern for the benefit of creditors and other parties in interest.

32.     Under the CCAA, the Debtors' management and board of directors remain in place, and subject to obtaining the Monitor's approval, the board maintains its power under Canadian law to approve significant actions, including disposing of important assets, borrowing significant amounts, or changing corporate structures.   The Debtors' assets and affairs are subject to the supervision of the Canadian Court during the pendency of a Canadian Proceeding. In addition, the Canadian Court appoints a monitor who functions as an independent observer of the proceedings under the CCAA and (i) monitors the Debtors' ongoing operations, (ii) reports to the Canadian Court on any major events affecting the Debtors, (iii) notifies creditors and shareholders of any meetings and tabulates votes at these meetings, (iv) assists with preparing, filing, and holding meetings for voting on the plan of arrangement, and (v) prepares a report on the plan of arrangement, which is usually included in the mailing of the plan.   Ernst & Young Inc. is the Canadian Court-appointed monitor in the Canadian Proceeding (the "Monitor").

33.     Furthermore, the Canadian Proceeding is collective in nature.   Parties of interest may appear and be heard and may weigh in on significant events such as the approval of a transaction consummated through the sales process.

34.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business or "nerve center."   I believe that the Canadian Proceeding meets this requirement.   As described above, the Debtors are headquartered in Canada and the vast

majority of their substantive business operations takes place in Canada.    In other words, Canada is where the Debtors' principal place of business and "nerve center" is located.

35.    Additionally, I understand that another requirement for recognition is that the foreign representative applying for recognition be "a person or body."    I understand that the Bankruptcy Code defines "person" to include corporations.    RCR, the Foreign Representative in these cases, is a corporation and therefore is a "person" within the meaning of the Bankruptcy Code.    Accordingly, I believe that this requirement is met.

36.    I further understand that the chapter 15 petitions must satisfy the provisions of section 1515 of the Bankruptcy Code, which I understand to require the following: (a) the filing of a petition for recognition by the foreign representative; (b) the filing, with the petition, of a certified copy certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (c) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative; (d) English translations of documents, where applicable.    I believe these requirements are all met.

37.    On the date hereof, the Foreign Representative filed petitions for recognition of the Canadian Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.    The Foreign Representative attached to the petitions certified copies of the Canadian Initial Order and the amended and restated Canadian Initial Order that authorized RCR to act as the Foreign Representative.    Additionally, the Foreign Representative indicated on the petitions that the Canadian Proceeding is the only foreign proceeding known to the Foreign Representative.    Finally, as the Canadian Proceeding is conducted in English (as well as French), no translation is needed, and English versions of the Canadian Court's orders have been submitted.

38.     For these reasons, I believe that the Canadian Proceeding qualifies as a "foreign main proceeding" and respectfully request, on behalf of the Foreign Representative, that the Court recognize it as such.

B.      **Need for Provisional Relief**

39.     In addition to seeking recognition on a final basis, the Foreign Representative also requests a provisional stay coextensive with the automatic stay under section 362 of the Bankruptcy Code and the protections of section 365(e) of the Bankruptcy Code.   A stay of proceedings against the Debtors and their assets located in the United States, as well as the provisional application of section 365(e) of the Bankruptcy Code, is crucial to preserve key contracts and prevent any creditors of the Debtors from pursuing remedies and taking other actions that may have a cascading and devastating effect and result in significant erosion in the value of the Debtors' assets to the detriment of all stakeholders.   It is imperative to the Foreign Representative's ability to preserve the value of the Debtors' assets that the Foreign Representative has an opportunity to oversee and pursue the sales process without the interference and distraction of adverse creditor or contract-counterparty actions.

40.     Without the stay, there is a material risk that contract counterparties, creditors, or others may take precipitous action detrimental to the Debtors and their creditors as a whole.   Indeed, prior to commencing the Canadian Proceeding, several creditors—including creditors with debts denominated in U.S. dollars—were threatening legal action against the Debtors and their assets.   The stay and contract protections of sections 362 and 365(e) are necessary on an interim basis to prevent any such parties from attempting to exercise self-help remedies as a result of commencing these chapter 15 cases.

41.     Accordingly, applying section 362 and 365(e) of the Bankruptcy Code is necessary so that the Debtors' are not faced with adverse creditor actions and contract counterparties continue to honor agreements entered into with the Debtors.

## C.    Noticing Procedures

42.     The Foreign Representative has also filed a motion requesting that the Court schedule a final recognition hearing and approve related noticing procedures (the "Notice Procedures Motion").   I can attest that the Debtors have hundreds of creditors, potential creditors, and other parties in interest, all of whom need to be provided with, among other things, notice of the provisional order, the proposed final order, the recognition objection deadline, and the recognition hearing. The Foreign Representative has prepared a form of notice advising of these and related matters (the "Recognition Hearing Notice"), a copy of which is annexed to the Notice Procedures Motion.

43.     Under the facts and circumstances of the Debtors' chapter 15 cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

44.     Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## D.    Joint Administration

45.     The Foreign Representative has also filed, contemporaneously herewith, a motion seeking entry of an order directing joint administration of these chapter 15 cases for

procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered chapter 15 cases.

46.     I believe that joint administration of these chapter 15 cases is warranted because RCR's financial affairs and business operations are closely related with its wholly-owned subsidiary, Dennis, and because it will ease the administrative burden of these cases on the Court and interested parties.   I can confirm that the Foreign Representative anticipates that the various notices, motions, hearings, orders, and other pleadings in these cases will affect both of the Debtors.

47.     Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest.   I have further been advised that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court.   I believe that the proposed caption set forth in the joint administration motion should be approved as the modified caption for these chapter 15 cases.

48.     I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought in the joint administration motion is purely procedural and not intended to affect substantive rights.   I have been advised that each creditor and party in interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right.   I have also been advised by counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. Finally, I have been advised that if the requested relief is granted, the Clerk will be relieved of the burden of entering duplicative orders and keeping

duplicative files, and supervision of the administrative aspects of these cases by the Office of the U.S. Trustee for the District of Delaware will be simplified.

49. Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

I certify penalty of perjury under the laws of the U.S. that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 18, 2018
      Montréal, Québec

/s/ _____
Mario Petraglia
President and Chief Executive Officer
RCR International Inc., the Foreign
Representative of RCR International Inc.
and W.J. Dennis & Company