## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| RCR INTERNATIONAL INC., *et al.*, | ) Case No. 18-10112 (LSS) |
| | ) |
| | ) Jointly Administered |
| Debtors in a Foreign Proceeding.[1] | ) |
| | ) **Requested Hearing Date:** |
| | ) **On or before March 13, 2018** |
| | ) **Requested Objection Deadline:** |
| | ) **Noon one business day prior to** |
| | ) **the Hearing Date** |

**MOTION OF THE FOREIGN REPRESENTATIVE UNDER SECTIONS 105(a),
363, 365, 1501, 1514, 1520 AND 1521 OF THE BANKRUPTCY CODE, AND
BANKRUPTCY RULES 2002, 6004, 6006 AND 9014, FOR ENTRY OF AN
ORDER (I) RECOGNIZING AND ENFORCING THE CANADIAN APPROVAL
AND VESTING ORDER, (II) APPROVING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS
AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

RCR International Inc. ("RCR"), in its capacity as the authorized foreign

representative (the "Foreign Representative") of RCR and W.J. Dennis & Company (the

"Debtors"), hereby moves (the "Motion"), for entry of an order substantially in the form attached

hereto as **Exhibit A** (the "Proposed Order") under sections 105(a), 363(b), (f), (m) and (n); 365,

1501, 1514, 1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), (a) recognizing and enforcing in the United States the approval and vesting order (the

"Canadian Sale Order," a copy of which is attached as **Exhibit B**) issued by the Superior Court

of Quebec (Commercial Division) in and for the Judicial District of Montréal (the "Canadian

---

[1]     The Debtors in these jointly administered cases are RCR International Inc. and W.J.
Dennis & Company. The Debtors' mailing address is 180, rue de Normandie,
Boucherville (Québec), J4B 5S7, Canada. RCR International Inc.'s Canadian Business
Registration Number is 104424031RC0002 and the last four digits of W.J. Dennis &
Company's U.S. federal EIN are 3775.

Court") for the sale (the "Sale") of substantially all of the Debtors' assets, (the "Purchased Assets"), save and except for the carpet and rug runner inventory and the associated racking and displays (the "Excluded Assets"), to Loxcreen Canada Ltd. d/b/a M-D Canada, a subsidiary of M-D Building Products, Inc. ("MD" or the "Purchaser") pursuant to the asset purchase agreement with MD (the "Purchase Agreement," a redacted copy of which is attached as **Exhibit C**)[2] (b) approving, under section 363 of the Bankruptcy Code, the Sale of the Debtors' right, title, and interest in and to the Purchased Assets to the Purchaser, free and clear of all liens, claims, encumbrances and other interests; and (c) granting related relief. In support of this Motion, the Foreign Representative relies on and incorporates by reference (a) the *Declaration of Mario Petraglia*, a copy of which is attached as **Exhibit D**, (b) the *Motion for Issuance of an Order Extending the Stay of Proceedings and Approval and Vesting Order* (the "AVO Motion")[3] filed by the Debtors in the Canadian Court, a copy of which is attached as **Exhibit E**, and (c) the *Declaration of Mario Petraglia in Support of (I) Chapter 15 Petitions for Recognition of Foreign Main Proceeding; (II) Motion of Foreign Representative for Entry of Provisional and Final Relief in Aid of Foreign Main Proceeding; and (III) Certain Related Relief* filed on January 18, 2018 at Docket No. 3, and further respectfully states as follows:

---

[2]    The purchase price and deposit amounts under the Purchase Agreement are redacted pursuant to the Canadian Court's order sealing such terms. Once the sale has closed in Canada, the Foreign Representative anticipates that it will be able to file an unredacted copy of the Purchase Agreement disclosing the purchase price and deposit amounts in advance of the hearing on this Motion.

[3]    Capitalized terms not otherwise defined herein are defined in the AVO Motion.

## PRELIMINARY STATEMENT

1.      The Debtors own and operate a business that markets and distributes products for home/window insulation and weatherization and sealing, flooring, and hardware and seasonal applications. The Debtors' products are sold through do-it-yourself retailers.

2.      The Debtors began marketing efforts to initiate a sale as a going concern in September 2017. Those sale efforts continued after the Debtors commenced proceedings (the "Canadian Proceeding") under the *Companies' Creditors Arrangement Act* (Canada) (the "CCAA") in the Canadian Court on November 21, 2017.

3.      Unfortunately, the Debtors recently learned that two of their largest customers have taken steps to end their business relationships with the Debtors and move their business to a competitor of the Debtors. Despite the Debtors' best efforts to preserve these important customer relationships, the Debtors have not been able to retain these customers.

4.      As a result of the significant and unanticipated loss in business, the Debtors were forced to expedite the sale process in order to preserve the remaining value of their business. The Debtors therefore sought and obtained expedited sale relief before the Canadian Court approving the sale of substantially all of their assets to MD. Furthermore, because the Sale includes assets within the territorial jurisdiction of the United States, the Debtors are also seeking expedited sale relief from this Court.

5.      The Purchase Agreement requires that the Canadian portion of the Sale closes on or before March 9, 2018, with the funding for U.S.-located Purchased Assets placed into escrow, held in trust by the Court-appointed monitor, Ernst & Young Inc., (the "Monitor"), pending approval by this Court. Final approval from this Court must be obtained before March 21, 2018, or the funds are released back to MD. As described in more detail herein, the Foreign

Representative believes approving the Sale on an expedited basis is the best—and likely only— chance to preserve and maximize value.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

7.      The Foreign Representative consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8.      Venue in this district is proper under 28 U.S.C. §§ 1410(1) and (3).

9.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 1501, 1514, 1520 and 1521 the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

**Procedural History**

10.      On November 21, 2017, the Debtors commenced the Canadian Proceeding in the Canadian Court.

11.      On the same date, the Canadian Court issued an initial order (as amended and restated on January 16, 2018, the "Initial Order") that, among other things, granted a stay of proceedings against the Debtors.  The Initial Order authorized the Debtors to conduct a sale and investor solicitation process to solicit offers for the purchase of either a part of or all of the

Debtors' business. Additionally, under the Initial Order, the Monitor was appointed as monitor of the Debtors in the Canadian Proceeding.

12.    On January 16, 2018, the Initial Order was amended and restated to authorize RCR to act as the foreign representative of the Debtors, and to grant RCR authority to apply for recognition of the Canadian Proceeding in the United States.

13.    On January 18, 2018, RCR, as Foreign Representative, filed petitions in this Court under chapter 15 of the Bankruptcy Code for recognition of the Canadian Proceeding as a foreign main proceeding, thereby commencing the Debtors' chapter 15 cases.

14.    On February 14, 2018, this Court entered a final order (D.I. 18) granting recognition of the Canadian Proceeding as a foreign main proceeding.

## The Sale and Investor Solicitation Process ("SISP")

### Pre-filing SISP

15.    The Debtors engaged Lincoln International LLC (the "Financial Advisor") on September 11, 2017, to assist in the review and consideration of potential strategic alternatives. The Bank of Montreal ("BMO"), as the Debtors' secured lender, was consulted during the selection of the Financial Advisor and the Debtors have kept BMO regularly apprised throughout the sale process.

16.    The Debtors and the Financial Advisor worked together to prepare detailed marketing materials including, a confidentiality agreement for potential buyers, a teaser letter, a financial model and a confidential information presentation (the "CIP").

17.    A total of 168 potential buyers were contacted and approximately 35% of these potential buyers executed a confidentiality agreement and were provided with the CIP. At the deadline for submitting indications of interest ("IOI"), the Financial Advisor received six

IOIs, four from strategic buyers and two from financial buyers.  The Debtors and the Financial Advisor reviewed the IOIs with BMO.

*Phase 1 of the SISP*

18.    The Phase 1 Bid Deadline was December 21, 2017.  During Phase 1 of the SISP, the Debtors and the Financial Advisor, with the assistance of the Monitor: (i) arranged for notice of the SISP in the *Globe and Mail* (National Edition) and in *Le Devoir*, (ii) engaged 98 new potential bidders and re-engaged 87 potential bidders that participated in the pre-filing sale process, (iii) updated the CIP, (iv) held due diligence calls, (v) set up and provided access to the data room, and (vi) hosted management presentations and facility tours with potential bidders.

19.    During this time, 15 potential bidders were active in the data room performing due diligence on the Debtors and some of those potential bidders started to make due diligence requests.  The Debtors, with the assistance of the Financial Advisor and the Monitor, worked diligently to satisfy all reasonable requests.

20.    The Phase 1 Bid Deadline culminated in a total of 13 Phase 1 Bids from both strategic and financial bidders.  After a thorough review of the Phase 1 Bids by the Debtors, with the assistance of the Financial Advisor and the Monitor, and in consultation with BMO, all Phase 1 Bidders were included in Phase 2 of the SISP.

*Phase 2 of the SISP*

21.    At the outset of Phase 2 of the SISP, the Financial Advisor provided feedback and discussed the relative competitiveness of Phase 1 Bids with certain Phase 1 Bidders to provide those Phase 1 Bidders with the best opportunity to make a competitive Phase 2 Bid.

22.    After the Phase 1 Deadline, one party involved in the pre-filing sale process delivered a Phase 1 Bid.  The Debtors, with the assistance of the Financial Advisor and the Monitor, decided to allow this bidder to proceed to Phase 2 of the SISP.

23.     Two additional parties approached the Financial Advisor after the Phase 1 Bid Deadline with interest in some or all of the Business.  After consultation with the Financial Advisor and the Monitor, the Debtors allowed the two parties to participate in Phase 2, but these two parties were informed that they needed to submit a binding Phase 2 Bid by January 26, 2018.

24.     During Phase 2, the Debtors, with the assistance of the Financial Advisor, among other things: (i) hosted 12 management presentations in Boucherville and New York City; (ii) conducted 11 site tours at the Debtors' Quebec facilities and coordinated four physical inventory inspections; and (iii) held over 35 diligence calls with Phase 2 Bidders and answered over 150 distinct diligence questions.

25.     Throughout the SISP, the Debtors, the Financial Advisor and the Monitor held weekly update calls with BMO to keep BMO apprised of any developments and solicited feedback from BMO with respect to the SISP and the ongoing efforts to sell the business.

26.     The above efforts culminated in the Debtors receiving seven binding Phase 2 Bids on the Phase 2 Bid Deadline.

27.     While the Debtors were considering the next steps to maximize the value of a transaction under the SISP, the Debtors learned that their largest two customers in the Insulation and Ceiling Division had taken steps to award their business to a competitor of the Debtors.  The Debtors immediately contacted the customers' representatives to see if these customers would reconsider their decisions.  These efforts were unsuccessful.

28.     Once the loss of business was confirmed, the Debtors, through the Financial Advisor, reached out to the Phase 2 Bidders to convey the information and suggested that certain Phase 2 Bidders consider and deliver a revised Phase 2 Bid.  The Debtors, with the

assistance of the Financial Advisor and the Monitor, consulted with BMO through this process and sought its input on the revised direction of the SISP.

29.    Revised Phase 2 Bids were received from five Phase 2 Bidders.  The Debtors, with the assistance of the Financial Advisor and the Monitor, and in consultation with BMO, reviewed and considered the revised Phase 2 Bids.

30.    On February 7, 2018, the Debtors, through the Financial Advisor, notified two Phase 2 Bidders of their selection as Successful Bidders through the SISP.  One Successful Bidder was interested in purchasing substantially all of the assets related to the Flooring Division and the Hardware and Seasonal Division and the other Successful Bidder was interested in purchasing substantially all of the assets related to the Insulation and Sealing Division.

31.    Thereafter, the Debtors, with the assistance of the Financial Advisor and the Monitor, commenced negotiations with each of the Successful Bidders with a goal to finalize and enter into separate asset purchase agreements for the respective Divisions.

32.    However, during the negotiation of the definitive agreements, the Successful Bidder interested in purchasing the Flooring and Hardware and Seasonal Divisions delayed in advancing the agreements and communicated to the Financial Advisor that it would lower the purchase price for the Flooring and Hardware and Seasonal Divisions. The Debtors, the Financial Advisor and the Monitor became concerned that this Successful Bidder would no longer close the transaction before further value eroded in respect of these Divisions.

33.    While the Debtors considered their options, the Financial Advisor approached MD with respect to purchasing the Flooring and Hardware and Seasonal Divisions. MD indicated its interest in purchasing a majority of the assets related to both Divisions.  With a

view to closing the MD transaction as quickly as possible and maximize value, the Debtors worked diligently to finalize the MD transaction.

34.    Pursuant to the terms the Purchase Agreement, the Sale must close by March 9, 2018. Furthermore, if the Sale is not recognized and enforced in the United States by March 21, 2018, a portion of the purchase price held in escrow will be returned to MD rather than released to the Debtors.

## THE MD TRANSACTION

35.    Pursuant to the Purchase Agreement, MD seeks to acquire substantially all of the Debtors' fixed assets, rolling stock, inventories (including raw materials, packaging and work-in-progress), intellectual property, marketing materials and other assets, tangible or intangible, in respect of the Business, save and except for the Excluded Assets. A redacted copy of the Purchase Agreement is attached to this Motion as **Exhibit C**.

36.    The salient terms of the Purchase Agreement are:

(a)    a cash payment related to the Intellectual Property and all other Purchased Assets other than the Excluded Assets;

(b)    payment in full of prepaid deposits for In-Transit Inventory;

(c)    payment in full of In-Transit Inventory, net of Inventory Deposits and Post-Filing Accounts Payable relating to In-Transit Inventory;

(d)    payment of 40% of the value of all On-Hand Inventory, valued at the lower of the most recent cost or current manufactured cost;

(e)    the assumption of all liabilities and obligations relating to the Purchased Assets (as defined in the Purchase Agreement);

(f)    the reimbursement by MD to the Debtors of $2,443 CAD per day, reflecting 50% of the occupancy costs relating to the Boucherville Warehouse from the Closing Date to May 1, 2018, to facilitate the removal of Inventory prior to May 1, 2018;

(g)    the disclaimer of the current lease for the Longueuil Warehouse and the reimbursement by MD to the Debtors for $74,686,

reflecting 100% of the occupancy costs relating to the Longueuil Warehouse for the 30 day period between the Closing Date and the Lease Termination Date;

(h)    the execution of a Transactional Trademark License Agreement (as defined in the Purchase Agreement) to all the Debtors to use certain trademarks while the Debtors liquidate the Carpet Inventory with six months of the Closing Date, using commercially reasonable efforts; and

(i)    the execution of a Transition Services Agreement (as defined in the Purchase Agreement) to assist MD with the removal of Inventory from the Boucherville Warehouse.

37.    Under the Purchase Agreement, a certain amount of the purchase price shall be segregated and held by the Monitor in trust relating to the value of assets located in the United States (the "Escrow Amount"). The Escrow Amount shall be released to the Debtors upon the issuance of the Proposed Order attached to this Motion as **Exhibit A** (the "Debtors' Escrow Release Event"). If the Debtors' Escrow Release Event does not occur by March 21, 2018, the Monitor shall remit the Escrow Amount to MD and the inventory located in the United States is deemed to be removed from the Purchased Assets (the "Purchaser's Escrow Release Event").

38.    The Purchase Agreement is subject to the following main conditions:

(a)    the Purchase Agreement is approved and a vesting order is issued in the CCAA proceedings within three business days of its execution;

(b)    the Purchase Agreement is approved and a vesting order is issued in these chapter 15 cases within 21 days after the service of this Motion, and in all events prior to March 21, 2018;

(c)    no amounts shall be owing by the Debtors to JBS Logistics, Inc. under the Warehouse Services Agreement dated October 1, 2017;

(d)    the execution of the Intellectual Property Assignment Agreement (as defined in the Purchase Agreement);

(e)    the execution of the Transitional Trademark License Agreement (as defined in the Purchase Agreement);

(f)    the execution of the Transition Services Agreement (as defined in the Purchase Agreement);

(g)    the disclaimer of the lease for the Boucherville Warehouse; and

(h)    closing by March 9, 2018.

39.    There is no financing condition as part of the Purchase Agreement.  MD has sufficient cash from immediately available sources (including existing committed financing sources) for the entire amount of the purchase price and does not require additional external financing to complete the transaction.

40.    The Purchase Agreement can be terminated by mutual written consent or by MD: (i) for a material breach of the MD Agreement, (ii) the failure to satisfy any of the closing conditions, or (iii) at MD's election if the Purchased Assets, or a portion of them, are materially damaged, destroyed, appropriated, expropriated or seized.

**Additional Disclosures Under Local Rule 6004-1(b)(iv)**

41.    Consistent with the requirements of Local Rule 6004-1(b)(iv), the Foreign Representative makes the following additional disclosures concerning the MD transaction:

| Sale to Insider | MD is not an insider of the Debtors. |
|---|---|
| Agreements with Management | MD has no agreements with management of the Debtors. |
| Releases | The Purchase Agreement does not provide for a release of claims. |
| Private Sale/No Competitive Bidding | As described above, the Sale was conducted through a robust, multi-phase marketing process under the supervision of the Monitor and the Canadian Court, with the secured lenders being kept apprised of developments, and was subject to higher and better bids. |

| | |
|---|---|
| Closing and Other Deadlines | The Sale must close by March 9, 2018. Furthermore, the Foreign Representative must obtain entry of the Proposed Order by March 21, 2018, or all amounts held in escrow relating to the U.S. Purchased Assets will be released to MD, not to the Debtors. |



| | |
|---|---|
| Interim Arrangements with Proposed Buyers | The Purchase Agreement does not provide for interim arrangements of the nature contemplated by Local Rule 6004-1(b)(iv)(G). |



| | |
|---|---|
| Record Retention | The Purchase Agreement provides that, for a period of seven years from the Closing Date or for such longer period as may be required by Law, the Purchaser will retain all original Books and Records that are transferred to such Purchaser. So long as any such Books and Records are retained by the Purchaser pursuant to the Purchase Agreement, upon |

| | reasonable notice and for any proper purpose, the Debtors and their respective assigns and representatives shall have the right to access, inspect and make copies (at their own expense) of such Books and Records during normal business hours and without undue interference to the conduct of Business. The Purchaser has the right to have its representatives present during any such inspection. |
|---|---|



| Sale Free and Clear of Unexpired Leases | Not applicable. Neither of the Debtors leases or subleases property to a third party. |
|---|---|



| Relief from Bankruptcy Rule 6004(h) | Given the need to obtain final approval of the Sale in the United States by no later than March 21, 2018, the Foreign Representative seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). |
|---|---|

## RELIEF REQUESTED

42.     The Foreign Representative seeks the entry of an order, substantially in the form of the Proposed Order, pursuant to sections 105(a), 363(b), (f), (m) and (n), 365, 1501, 1514, 1520 and 1521 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1: (i) recognizing and enforcing the Canadian Sale Order in the United States; (ii) approving the Sale of the Purchased Assets to the Purchaser free and clear of all liens, claims, encumbrances and other interests; and (iii) granting related relief.

## BASIS FOR RELIEF

**I.     The Court Should Recognize and Enforce the Canadian Sale Order and Approve the Sale Pursuant to Section 363 of the Bankruptcy Code.**

43.     Based on the extensive, multi-phase sale process conducted under the supervision of the Monitor and the Canadian Court, and the exigent circumstances that have developed as a result of the loss of two key customers, the Foreign Representative believes that

the Sale of the Purchased Assets in accordance with the terms and conditions of the Purchase Agreement represents the best realization of value for the Debtors' creditors and other stakeholders under the circumstances. Pursuant to the Purchase Agreement, entry of the Proposed Order, substantially in the form attached hereto, is a condition precedent to consummation of the Sale. This Court's recognition and enforcement of the Canadian Sale Order, and approval of the Sale under section 363 of the Bankruptcy Code, will permit the Debtors to sell the Purchased Assets without disruption and in a timely and efficient manner, and will prevent further erosion of value that would occur if additional customers left the Debtors' business as a result of the uncertainty caused by their restructuring proceedings. Absent the relief requested herein, the Debtors and their creditors will potentially suffer significant, if not irreparable, harm due to an inability to close the Sale with respect to the U.S. assets.

**A. Section 363 of the Bankruptcy Code is Applicable upon Recognition Pursuant to Section 1520(a) of the Bankruptcy Code.**

44.    Section 1520(a)(2) of the Bankruptcy Code provides, in relevant part, that "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . section[] 363 appl[ies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the section[] would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Moreover, section 1520(a)(3) provides that upon recognition of a foreign main proceeding "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section[] 363." 11 U.S.C. § 1520(a)(3); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 Bankr. LEXIS 5367, at *18 (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced

under chapter 15 of the Bankruptcy Code); *In re Fairfield Sentry Ltd.*, 768 F.3d 239, 244 (2d Cir. 2014) (same).  Section 363(b) provides, in pertinent part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

**B.      Entry into the Purchase Agreement is Warranted under Section 363(b) of the Bankruptcy Code.**

45.      Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate outside the ordinary course of business, courts in this Circuit and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  *See e.g. In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Grand Prix Assocs.*, 2009 Bankr. LEXIS 1779 (Bankr. D.N.J. June 26, 2009); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008).  Once the Foreign Representative, on behalf of the Debtor, articulates a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (internal quotations omitted); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

46.      The "sound business judgment" test requires a proponent of a sale to establish four elements in order to justify the sale or lease of property outside the ordinary course

of business. These factors are (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the trustee or debtor in possession has obtained a fair and reasonable price, and (d) that the purchaser has acted in good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).[4]

47.    The Foreign Representative submits that ample business justification exists to sell the Purchased Assets to the Purchaser under the terms of the Purchase Agreement. The Sale satisfies all four conditions set forth in *Abbotts Dairies*. First, sound business purposes justify the Sale. The Foreign Representative believes that the Sale presents the best opportunity for the Debtors to maximize the value of the Purchased Assets. Second, the Foreign Representative believes that the Sale establishes a fair and reasonable price for the Purchased Assets and that the purchase price is the best offer received in view of the recent losses of key customers and the need for a prompt closing to avoid additional loss of customers. Third, fair and reasonable notice has been provided to parties interested in the Sale. Pursuant to the multi-phase sale process supervised by the Monitor and the Canadian Court, the Debtors and their advisors engaged in extensive negotiations to solicit higher and better offers for the Purchased

---

[4]    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case. Section 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court employs its equitable powers to achieve a result consistent with the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

Assets from interested parties. Moreover, all known creditors, stakeholders and parties in interest are being served with a copy of this Motion by overnight delivery or other comparable expedited delivery in accordance with the *Order (I) Specifying Form and Manner of Service of Notice Under Sections 105(a), 1514 and 1515 of the Bankruptcy Code and Bankruptcy Rules 2002 and 9007, and (II) Scheduling Hearing* (D.I. 5). Fourth, as discussed more fully below, the negotiation process undertaken in connection with the Sale satisfies the good faith requirement. Put simply, the Sale is the product of good faith and arm's-length negotiations among the parties.

48. Moreover, courts in this Circuit have granted relief similar to the relief requested in this Motion and approved the sale of assets in ancillary proceedings pursuant to sale processes conducted in foreign proceedings. *See e.g. In re Elpida Memory, Inc.*, Case No. 12-10947 (CSS) (Bankr. D. Del. Jan. 16, 2013) (approving sale of debtor's U.S. assets under section 363 pursuant to sale process in Japan); *In re Xchange Technology Group LLC*, Case No. 13-12809 (KG) (Bankr. D. Del. November 25, 2013) (recognizing and enforcing sale order entered by Canadian court and separately authorizing and approving sale free and clear of any and all liens, claims, encumbrances and other interests under section 363); *Arctic Glacier International Inc.*, Case No. 12-10605 (KG) (Bankr. D. Del. July 17, 2012) (same); *In re EarthRenew IP Holdings LLC*, Case No. 10-13363 (CSS) (Bankr. D. Del. February 18, 2011) (same); *In re Grant Forest Products,* Case No. 10-11132 (PJW) (Bankr. D. Del. April 26, 2010) (same); *In re Destinator Technologies Inc.*, Case No. 08-11003 (CSS) (Bankr. D. Del. July 8, 2008) (same).

49. This Court's recognition and enforcement of the Canadian Sale Order and approval of the Sale under section 363 is not only warranted but is critical to achieving the anticipated results of the Sale, as it will permit the Debtors to sell the Purchased Assets without disruption and provide further certainty to the Sale and to the Purchaser, thereby maximizing the

value that can be achieved under the circumstances.  Absent the relief requested herein, the Debtors will likely suffer substantial, if not irreparable, harm from the inability to sell the Purchased Assets without interference and in a manner that will allow the Debtors to maximize recoveries for all creditors and other stakeholders.  If the Sale is not approved by this Court on or before March 21, 2018, the Debtors will forfeit a significant amount of the purchase price held in escrow.

50.    For all of the foregoing reasons, the Foreign Representative respectfully submits that there is more than ample justification for this Court to enter the Proposed Order, thereby recognizing and enforcing the Canadian Sale Order in the United States and authorizing the Sale pursuant to section 363 of the Bankruptcy Code.

## C.    The Court Should Approve the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to Section 363(f) of the Bankruptcy Code.

51.    The Foreign Representative also respectfully requests that this Court authorize the Sale free and clear of liens, claims, encumbrances and other interests.  Under section 363(f) of the Bankruptcy Code, a trustee or a debtor in possession may sell all or any part of a debtor's property free and clear of any and all liens, claims, encumbrances and other interests in such property if (i) such a sale is permitted under applicable non-bankruptcy law, (ii) the party asserting such a lien, claim or interest consents to such sale, (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is

written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims, encumbrances and other interests under section 105 of the Bankruptcy Code. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

52.    The Foreign Representative respectfully submits that a sale of the Purchased Assets other than one free and clear of all liens, claims, encumbrances and other interests would yield substantially less value for the Debtors and their creditors than the Sale will, and that the Sale free and clear of all liens, claims, encumbrances and other interests is in the best interests of the Debtor, its creditors, and other parties in interest. Moreover, the Purchaser would not have entered into the purchase agreement and would not consummate the Sale contemplated thereby, thus affecting the Debtors, their creditors, and other parties in interest, if the Sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims, encumbrances and other interests. With respect to any and all creditors that may assert an interest in the Purchased Assets, the Foreign Representative submits that at least one of the subsections of 363(f) applies to such creditors and, in most cases, more than one of the subsections of 363(f) is satisfied. Moreover, insofar as the Foreign Representative is aware, BMO holds the only liens that exist on the Debtors' property located within the territorial jurisdiction of the United States, and BMO has consented to the Sale. Furthermore, the property that exists within the territorial jurisdiction of the United States consists of inventory supplied to W.J. Dennis by RCR. As a result, the Foreign Representative does not believe there are any

third parties that could assert liens or other encumbrances on the inventory as purchase money

security interests or through reclamation demands or otherwise.

53.     Accordingly, the Foreign Representative submits that the Sale of the

Purchased Assets free and clear of all liens, claims, encumbrances and other interests satisfies the

statutory prerequisites of section 363(f) of the Bankruptcy Code.

### D.    The Court Should Afford the Purchaser All Protections under Sections 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser.

54.     In addition to the relief requested above, the Foreign Representative

requests that the Purchaser receive the protections set forth in sections 363(m) and (n) of the

Bankruptcy Code. Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an
> authorization under subsection (b) or (c) of this
> section of a sale or lease of property does not affect
> the validity of a sale or lease under such
> authorization to an entity that purchased or leased
> such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless
> such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," courts have

stated that "the phrase encompasses one who purchases in good faith and for value." *In re*

*Abbots Dairies of Pa.*, 788 F.2d at 147 (internal quotations omitted).  Courts have held that in

order to demonstrate a lack of good faith, a party would have to show "fraud or collusion

between the purchaser and [seller] or an attempt to take grossly unfair advantage [of other

potential purchasers.]" *Id.*

55.     The Purchase Agreement was negotiated without fraud or collusion, in

good faith and from an arm's-length bargaining position, and was not entered into for the

purpose of hindering, delaying, or defrauding present or future creditors of the Debtors under the

Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia or Canada. To the best of the Foreign Representative's knowledge, no party has engaged in any conduct that would cause or permit the Sale to be set aside under section 363(n) of the Bankruptcy Code. Accordingly, the Foreign Representative seeks a finding that the Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not violated section 363(n) of the Bankruptcy Code.

## II.    Waiving the Stays Imposed by Bankruptcy Rules 6004(h) and 6006(d) is Necessary and Appropriate Under the Circumstances.

56.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Foreign Representative requests that the Proposed Order, once entered, be effective immediately by providing that, to the extent applicable, the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived. Time is of the essence with respect to the Proposed Order due to the structure of the Sale transaction. The Purchaser has made clear to the Foreign Representative that recognition of the Sale on an expedited basis is a key consideration in entering into the Purchase Agreement. Should the Proposed Order not be entered by March 21, 2018, the Debtors will forfeit the Escrow Amount to the Purchaser. Forfeiting the Escrow Amount will deprive the creditors of significant value resulting from the transaction. In order to sell the Purchased Assets to the Purchaser in an expedient manner, the 14-day stay set forth in Bankruptcy Rules 6004(h) and 6006(d) should be waived. Such a waiver will benefit the Debtors and creditors by assuring

that value is realized before additional losses are suffered or the Escrow Amount is forfeited to the Purchaser.

## NOTICE

57.    The Foreign Representative will serve a copy of this Motion by overnight delivery, email, or other comparable expedited delivery in accordance with the *Order (I) Specifying Form and Manner of Service of Notice Under Sections 105(a), 1514 and 1515 of the Bankruptcy Code and Bankruptcy Rules 2002 and 9007, and (II) Scheduling Hearing* (D.I. 5). In light of the nature of the relief requested, the Foreign Representative submits that no further notice is required.

WHEREFORE, the Foreign Representative respectfully requests that the Court: (a) enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**; and (b) grant such other and further relief as it deems just and proper under the circumstances.


*[Signature follows]*

Dated:  February 28, 2018
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/   Matthew B. Harvey*
Derek C. Abbott (No. 3367)
Matthew B. Harvey (No. 5186)
1201 N. Market St., 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile:  (302) 658-3989
dabbott@mnat.com
mharvey@mnat.com

- and –

THORNTON GROUT FINNIGAN LLP
Rebecca L. Kennedy
Mitchell W. Grossell
Suite 3200, Canadian Pacific Tower
100 Wellington St. West
Toronto (Ontario), Canada M5K 1K7
Telephone: (416) 304-1616
Facsimile:  (416) 304-1313
rkennedy@tgf.ca
mgrossell@tgf.ca

*Counsel for RCR International Inc., in its capacity as*
*Foreign Representative of RCR International Inc. and*
*W.J. Dennis & Company*